Mr. Harold, you may proceed, sir. Thank you, Your Honor. May it please the Court, my name is Tyson Harold and I represent plaintiff Jose Antonio Poroza-Benitez. I would like to reserve three minutes for rebuttal. The facts of this case began on October 8, 2015, when Redding police officers executed a warrant on Mr. Poroza's apartment in Redding, Pennsylvania. Initially fearing a break-in, Mr. Poroza exited his third-floor apartment onto the roof and fled to a nearby abandoned structure, where he crawled out a second-story window. While Mr. Poroza was hanging from the windowsill, Officer Hazer punched him 45 times in the head to stun and disorient him, causing him to fall, break his right leg, and hit his head, knocking him unconscious. Mr. Poroza-Benitez, you may proceed, sir. Thank you, Your Honor. Mr. Poroza-Benitez, you may proceed, sir. What, in your mind, because clearly your position is there is a robust consensus, what are the cases that you think constitute that kind of robustness, or do you think it's beyond that, it's just, you don't need a case, it's just so obvious you can't punch somebody in the face when they're hanging two stories up, or is it both? What's the main thrust for your position? Your Honor, it's a mixture of both. It's kind of a hybrid case. We think that Tennessee v. Gardner in this case establishes general principles of law that a reasonable officer would know that you cannot punch somebody who's hanging out of a third-floor window, which constitutes deadly force under the circumstances, where that person does not pose a threat to officers or others. In this case, Mr. Poroza did not pose any threat to officers. There were no bystanders in the vicinity. And Mr. Poroza was effectively boxed in at that point. There was no realistic chance that he'd be able to escape. There was a call out that he was armed, that he had a gun, and in fact, there was a gun found later on the roof. So was it, is it within the bounds of reason for the, you know, not to be flippant about this, but you know, there's the famous Hans Gruber falling from the Nakatomi Tower scene where the guy's pulling a gun as he's falling. I mean, if he still had a gun, did he still pose a threat and could the officers have been reasonably concerned about a threat given that they had heard a call out about a gun? No, Your Honor, because Officer Hazer testified that he knew that Mr. Poroza did not have a gun when he was hanging out the window. So even though there was a call about the gun, Officer Hazer testified that based on what Mr. Poroza was wearing, which was just boxer shorts, he was able to assess that he did not have a weapon. And he was confident enough in that assessment to holster his own firearm and approach Mr. Poroza at the window. Officer Smith did the same thing, Officer Smith being in the room with Officer Hazer. And under the circumstances— But he's hanging out the window. We have the Eighth Circuit decision in McKinney that there may be circumstances to subdue a defendant before they put themselves in harm's way. And here we have your client's testimony that even he recognizes that they were trying to pull him up into the window in the first instance. Why isn't that a fairly unusual situation? We don't have any analogy in the case law of officers who are trying to subdue a defendant in the heat of the moment in order to pull him up and out of harm's way. Well, I don't think this is a—this is not an uplifted knife situation. The officers have the upper hand literally and figuratively here. There's two officers in the window. Mr. Poroza is hanging from the window. The officers are wearing body armor, helmets. They have eye protection. They have gloves on. But I think that to answer the question about no exact previous factually analogous case law, the Third Circuit in COPEC v. Tate held that the Third Circuit takes a broad view of what constitutes clearly established rights that a reasonable official would know of and that there does not have to be precise factual correspondence between a prior case and an instant case in order for a right to be clearly established. I think that the Taser cases are the other part of this hybrid clearly established argument we're making where, you know, there's like five or six cases where courts concluded that tasing someone anywhere between I think some of the cases were six feet off the ground to 20, 25 feet off the ground created a substantial risk to the person. So I think those cases are sufficient to put the officers on notice here. And I'll add that Officer Hazer knew that Mr. Poroza would injure himself if he fell. He testified that he knew that at the time that Mr. Poroza was hanging from the window. He also testified that he knew that if Officer Smith and himself let go of Mr. Poroza, that he would fall. And yet he punched him in the face four or five times to stun and disorient him, knowing that Mr. Poroza was slippery, that they're having trouble holding on to him, and then let him go and testify that his thinking was screw it. If you want to fall, you're going to fall. Well, you've noted that the tasing cases and let me just shift gears for a second and ask about Officer White, because there's a claim against Officer White as well. He's, he is not in the position of Officer Hazer. He is not, as you said, able to look up close to see whether there's a weapon. He's heard that there's a weapon. Sure, Your Honor. At some rate, the court needs to view the facts in a light most favorable to Mr. Poroza. He testified that when he fell, he did not move. He testified that he was, and that's partially by some of the officer's testimony. Officer Eppolito testified that he didn't see any escape attempts after Mr. Poroza fell. Officer Eppolito being on the sidewalk, only feet from where Mr. Poroza fell. And Officer Perkins, Officer White himself, and Officer Smith all testified that Mr. Poroza never got to his feet. I think one thing that I want to correct is that Officer White was not in a very different position from Officer Hazer. He was below Mr. Poroza. That's clear. Two stories below, right? I mean, there's a difference between holding somebody like physical contact right next to him, literally, and being two stories below looking up. Well, when Officer Hazer made his assessment about Mr. Poroza not being armed, he was not holding on to him. This is before he approached Mr. Poroza at the window. He made that assessment when he was on the other side of that second story room and Mr. Poroza was standing at the window trying to crawl out. And in this case, Officer White testified that at one point, before Mr. Poroza fell, he was directly beneath him. I think he estimated the distance to be 10 feet, which, Your Honor, I think is not that unlike the situation that Officer Hazer faced. And Officer Hazer was able to determine he didn't have a weapon. I think another telling fact in this case is that when Mr. Poroza initially crawled out the window, Officer White had his firearm out, but he was able to assess the situation and holstered his firearm and pulled out a taser, which suggests that he didn't think that Mr. Poroza did pose a threat to him, a threat of deadly force. Whether that's because he knew he didn't have a firearm or he didn't expect Mr. Poroza could or would be able to use it, it suggests that he didn't really think that his life or the life of other officers was in harm's way. And the Third Circuit in Russell v. Richardson, the Ninth Circuit and Brian McPherson both held that it is unreasonable for officers to believe that somebody wearing only boxer shorts that Mr. Poroza was wearing could conceal a firearm on their person. So Officer Hazer's assessment of the situation, the fact that he holstered his firearm in the Russell case, I think suggests that a jury could find a reasonable officer in White's position would not think Mr. Poroza to be armed. Counsel, Officer White is not able to see the other side of his body from standing on the ground. He's hanging out the window, right? And we have the audio files here that reflect this was rapid pace. All of this happens from the window to the fall to saying you've got to call EMS within seconds. So given that and the undisputed facts that the tasing was immediately or almost immediately upon his fall, how can we say there's clearly established case law that would tell Officer White where someone has heard he has a gun and may still have the gun for a reasonable officer in that position not to take action to subdue a potentially dangerous defendant? Well, Your Honor, I think there's a few facts here. The first is that Mr. Poroza had just fallen two stories. It's a material intervening event that a jury could conclude a reasonable officer would not think someone who just fallen two stories would would want to or even be able to pull out a firearm. The other thing is Officer White was only feet from where Mr. Poroza fell. He didn't see a firearm in his hands when he was hanging from the window. And viewing the fact of Mr. Poroza's not moving in a way most favorable to him, I think it's unreasonable for an officer to assume that Mr. Poroza could, you know, if he didn't have a weapon in his hands, it would have to be in his waistband because he wasn't wearing any other clothes, that Mr. Poroza would have to reach down, pull out the firearm. He was on his back, so he'd have to turn around to Officer White and shoot him at that point. Meanwhile, there are four officers there. They're feet away, two have tasers, one has a canine, and one has a rifle. If at any point Mr. Poroza had moved in a way that suggests he was trying to pull a firearm, it would have been reasonable to tase him. But he did not move viewing the facts in a way most favorable to him. So he didn't wait. And again, the record reflects that he was calling us to let the taser know that he was there immediately below and ready to prevent escape. Doesn't all of that indicate that in terms of the timing of this, he was tased immediately, almost immediately upon falling? And what case says in a circumstance where potentially there's danger that an officer has to wait and see if there's a gun pulled on them or if the suspect has the wherewithal to get up again and flee after a long chase like this? Well, I think the case is where I understand that there's cases out there that suggest that officers don't need to wait until a person's actually pointing a gun at officers to deploy force. But we weren't even close to that point in the situation. Mr. Poroza didn't have anything in his hands. He'd evinced no kind of force. He'd used no force against officers at that point, as all the officers testified. White testified he didn't see. He managed to arm himself as he was running, or at least the unrebutted record is that somebody said he's got a gun and they in fact found a gun later. So there's, you know, when you say he posed no threat, at least for somebody like Officer White on the ground, not in the window, he's heard gun. Isn't that enough to put him, put a reasonable officer at a level of concern where deploying non-lethal force like a taser is within the bounds of reasonableness, even if we look at the facts on in the light most favorable to your client? No? No, Your Honor. I think the fact that there were four officers there, there were plenty of personnel, two of the officers, one of the officers, again, they're feet away from him. So, you know, I think what should have happened here is one or two of the officers should have approached Mr. Poroza and searched him and put him in handcuffs, taking him into custody. But there were four officers there. You could have had two other officers as backup that were ready to tase him if he did move. And I think it's worth pointing out again that he just fell two stories onto a concrete stairwell. That's a significant fall. And so that's the material intervening circumstance I think that's positive here of why the force was excessive. If I understand you correctly, if we accept the facts in the light most favorable to your client, he was unconscious when he hit the ground and he was tased while being unconscious, correct? Right. Okay. Thank you very much, Mr. Harrell. We'll have you back on rebuttal. Ms. Ambrose? You are still muted, Ms. Ambrose. Good morning. Are you able to hear me? Yes. Thank you. May it please the court, Tricia Ambrose on behalf of officer Daniel White and criminal investigator Kevin Hazer. I wanted to start with the kind of a broader picture here and of what plaintiff's argument is or appellant's argument is. And appellant initially argues that the district court judge's decision is legally defective because she didn't determine prong one of qualified immunity. And I think towards the end of Mr. Harrell's argument, he kind of talked about whether the force used was reasonable. And that's not before the court. What's before the court is whether the officers violated a clearly established right of Mr. Perroza. And that argument hinges on or should hinge on whether or not we're operating on undisputed facts. Sounds to me in reading this material like we do have disputed facts. And since we do have disputed facts, we're obligated to take them on the face of the complaint. Right, Mr. Harrell and every reasonable inference. So if we do that and you've got in the case of officer or you put an investigator Hazer, we've got a guy who punches somebody in the face who is clearly not armed. And who is in a life threatening precarious situation and whose punches stun him and cause him to fall. That's the allegation and an officer white circumstance, somebody who approaches somebody who's just fallen two stories, sees them unconscious and tases them on. If we take it on that level, Miss Ambrose, what reasonable officer thinks those things are OK. I can punch somebody, make them fall two stories. I can tase them when they're unconscious on the ground. I would go back to Judge Krause's comments about what plaintiff did not dispute and what he does not dispute is that the officers were trying to pull him in. They were attempting to bring him in. Mr. Perosa had at that point. But let me interrupt you because from the plaintiff's perspective, I take it they think that means that makes no difference at all. You could be really nice to me one minute and then punch me in the face and make me fall two stories the next. And the fact that you offered me candy or you were good to me and helpful to me before doesn't really matter. What matters is, are you allowed to punch me in the face and make me fall two stories? And from from their complaint, that's what happened. Officer Hazard loses patience, punches a guy five, six times in the face, and it causes him to fall. So what reasonable officer thinks I can make somebody fall two stories by punching him in the face? That's OK. There's no there's no good officer or CIA. He's are on notice that his stunning blows to Mr. Perosa were unreasonable. I think comparing his actions to that of a taser does not put him on notice. Isn't the conduct so egregious? You really need a case. The guy's hanging from two stories up in his underwear and he's bleeding. And you even have the officer say words to the effect of screwed. If you want to fall, we're just going to let you fall. You need a case telling the police officer you can't do that. I think you do, Your Honor. The the undisputed evidence is that they were not intending to punch him to have him fall two stories. There is no dispute. They were trying to. Why are we looking at their intent at this stage of things? And if we have to go to that in to the extent is relevant to a reasonable officer's assessment of the risk to Mr. Perosa, why aren't we right back to being a jury question? Because the facts are undisputed and the fact of what they were attempting to do was undisputed. Your Honor, there's there has been no testimony that they were trying to push him from the window. They were attempting to bring him in. He was noncompliant. He was resisting, which he admitted to. And their attempt to bring him in with the stuff. True. All true. But wait, wait. That's all true. That they were trying to bring him in. How is that relevant to the objective assessment, not subjective, but the objective assessment of whether or not a reasonable officer would believe you can punch somebody in the face five to six times when they're hanging precariously from a second story window. How is how is the fact that a moment that that a moment or two before you were attempting to be helpful. How does how does that affect the undisputed fact? Well, I'll take that back because the number of punches is disputed, but we're going to take it as five to six punches in the face because that's what's in the complaint. How does how do you get around that factual scenario and say, like, who knew who knew that I could punch you in the face six times while you're hanging with your bloody slippery hands from the second story window and you would fall. How does that work. I think that's the point is he there's there's nothing that would have put hazer on notice that that was not unreasonable yet and other an officer next to him holding on to them. They were trying to get him in to prevent harm to himself and further escape. This is very different like the taser cases, Miss Ambrose is it like those cases where they've said you can't taste somebody when they're on a third story ledge you can't taste somebody when they're on a bridge and they might fall. If the, if the aim, and the professed aim was, I want to stun him. And a taser is to stun somebody. Why isn't it precisely analogous I can't do something to cause you to lose your senses when losing your senses might cause you to fall and injure yourself or kill yourself. Why isn't the punching in the face precisely analogous to a taser. I don't think it's analogous your honor because in this situation the officers were holding on to Mr. Rosa, he was not in standing over a ledge he was not, you know, not able to hang it from a window with two officers holding on to him which I think is an important distinction in that they were, they had their hands on. And when they realized they could not bring him in. That is when they let go. It depends on how we, whether we think about what, what, what the officer is assessing as whether a reasonable officer would consider it appropriate to use a stunning blow that carried some risk in order to pull someone in the window to, to, to avoid risk of harm. Versus looking at simply whether a reasonable officer would would understand that it violated his rights to use those stunning blows two stories up with the risk of serious injury as a result of the fall. I mean, I think that the, the difference as I've said here is that the risk to Mr. Rosa was much less if they were able to bring him in, if they were able to get him in the window, and they were both holding on to him. They were both attempting to keep him inside. I mean, this is very different from the taser case. And I think if he had. Hold on, hold on just a minute, Miss, Miss Ambrose because you say you keep saying they were trying to bring them in, they were holding on to him. Are we in a factual dispute area here because there was certainly a point and officer Hazard acknowledges it where he said quote him a little bit ago. Screw it. You want to fall. You can fall. And is there not some room for a fact finder to be looking at this thing and saying those blows came at a time and in a way where they weren't securely holding him. This wasn't merely a stunning blow this while they had him securely held. This was a frustration blow. And they weren't at that point securely holding him. I mean, are we aren't we looking at jury questions there. Are your honor because the undisputed evidence from plaintiff himself is that they were holding on to me. He acknowledged that they were holding on to him, and they only let go when it was determined that they would not be able to bring him in.  He doesn't agree to that. Right. The point is, it's not clear from the evidence or maybe you can point point us to where it is apparent that there's not a dispute about the sequence of the stunning blow versus when the decision was made to just let him fall. And as your honor noted, this was all rapidly evolving. I mean, this happened within seconds within seconds. I mean, Mr. Perot's actually. So for to expect criminal investigator hazer at that moment to ascertain whether he was on notice that on this specific set of circumstances, he couldn't attempt stunning blows to bring him in. I think is not. It's not a question that he would have been able to answer in that moment. If we were talking about a teaser. Mr. Perot's it was standing at the window and was tased. We wouldn't be here before your honors, but this is a very factually specific situation that CI hazer was not on notice that his actions in this rapidly evolving situation would have violated a clearly established constitutional right. Why are those distinct. I mean, is there really some difference in the anticipated effect of multiple blows to the head versus a teaser. Well, I think they're distinct your honor because the taser cases are generally from at a distance. And like I said before, the plaintiff was being held on to he was being held on. Presumably, if he was hanging from the window and not being held on to we would have already fallen. And like I said, well, No, not necessarily. Right. I mean, he did he he was holding on to the windowsill. And that's, that's sort of the crucial question you're saying it's undisputed that they were holding him. While every punch was administered or that they were holding him securely while every punch was administered. And the question is, is that a factual dispute or not, but shifting to officer white for a minute. If we, if we take the, the claim of the plaintiff. Mr. Perot's Benita says I was unconscious. I was not moving. I was unconscious. Is there, is there anything in the law that would provide for a reasonable officer to think it's okay to taste people who are completely defenseless and unconscious. That's not the position we're taking. It's not our position that a use of a taser on someone that is unconscious is appropriate, but officer white taste. Mr. Perot's that immediately upon falling. There is no evidence that he was aware that he was unconscious. At that point, he was No, there's a dispute. There's every, every reasonable inference has to be drawn in favor of Mr. Perot's Benita's and his assertion is I was, I was unconscious. Now you're, you're making assertions about the timing. But once again, isn't that a factual dispute his, his, his assertion is I was laying there unconscious and he tased me your assertion is no, no, it happened so fast. Nobody knew you were unconscious shouldn't a jury look at the facts and decide who they believe That he was tased immediately. There's no dispute that there was any time went by as soon as he fell. He was immediately taste I don't dispute that he may have been unconscious and the trial judge accepted that he was unconscious, but he was tased immediately upon falling So your position, your position is that it's a reasonable officer could think somebody who's just fallen two stories. You don't wait. You don't look to see you don't check you just can immediately taste that that's that that's okay now taken At this point, we're taking what you say are the undisputed facts undisputed that it happened instantaneously. And there was no way to know that he was actually immobile, but even taking it in your way. You're saying that a reasonable officer would believe somebody who had fallen two stories, you can taste them instantly without knowing extent of injuries, whether they're even alive, you just taste them. And that that it's not clearly established in the law that you shouldn't do that. Right, Your Honor. That's, that's the legal position right That's the legal position and and taking into account. I know, Mr. Perosa has asked this court not to consider the entirety of the incident. In determining qualified immunity, but we're not just talking about a gentleman who just fell from a window. We're talking about a gentleman who Ran across rooftops broke into through glass into an abandoned building at some point was armed and had jumped out a window and attempt to continue to flee police. Mr. Perosa had made it clear that he was non compliant. And would attempt to resist arrest and based on those facts. It was not clearly established that officer white using the taser for one round immediately upon him falling in an attempt to gain compliance was violated clearly established right Council, we're talking here about a drop of 10 feet with the government's position be different. If what we had was a drop of 50 feet. Might be your honor. It could be. I mean, this was a second story window. It was a fall. But I mean, there was no no reason to think that just because he fell. He was then going to become compliant. I would also note that he fell in front of an open breeze way which would have provided another means of escape for Mr. Perosa Open breeze way he fell onto concrete steps going down to a basement right An open breeze way in front of him, Your Honor. Yeah. Okay. Thank you very much. Miss Ambrose for your argument. Mr. Harold will have your rebuttal, sir.  Is I'm not so sure it's clear that was only 10 feet. We attach the exhibit pictures of the of the fall. So your honors can can see that but This wasn't it was that we want to be clear. It was a second story window, but it wasn't a second story window on to ground level the stairs led down to as your honor mentioned a basement or breeze way. So we're really talking about I would say more than a story and a half. At this point, this is an old bro home. So it's it's a pretty significant fall and also point out that officer Hager knew How high that was. He went in into 952 Elm Street through the front of the building saw the breeze way he saw the stairs. He saw the porch. He saw everything that was there that could have been a hazard and even saw it when he was Engaged with Mr. Perosa at the window. He said he looked down and saw the porch. So we saw all of that. Well, Start with what I'm sorry. Start with where Miss Ambrose ended with with officer white that this, this is all happening instantaneously after a high speed chase with a guy he believes is armed who's resisting arrest at every step and that and aggressively resisting arrest. Doesn't doesn't that all play into this circumstance and which is not disputed that a reasonable officer could believe I need to immobilize this person immediately. They're, they're fleeing. They're aggressive. They're actually potentially armed and dangerous and I got to stop them. Sure. Well, I don't think this is As quickly as counsel for for the defendants, make it sound. I mean, Officer hazer testify that I think he testified that there was about a minute interaction when Mr. Perosa or Mr. Perosa went out the window and officer hazer was in the room with him. We know that officer white had time. I'm just talking. I'm just talking about officer white now and officer will end it and it stands to reason that even on your Set of facts that this is unrebutted because your client is unconscious by your account that the position that we're getting from the other side is it happened immediately. He hit the ground and they taste them white taste him. What if we assume that's true. So the white doesn't know. Oh, he's unconscious your legal position has to be You can't taste. You have to wait and see whether he's going to get up and pull a gun or see whether he's going to get up and try to run. Yeah, you can't immediately try to immobilize the person who has been fleeing and aggressively fighting the police. Is that right, Sure, Your Honor. Yeah, but I think Notice it's not a situation where he was fleeing and maybe slipped and there was a split second where he was he was lying down. I want to emphasize that he again that he had just fallen Two stories and and I want to emphasize again. There were four officers there so only feet away from where he fell. So we're not asking You know the officers to wait and see if he's going to pull out a gun. What we're suggesting is what should have happened is With four officers there one or two of the officers should have walked the three feet. I mean, they testify. They were three to five feet away from him when he fell So one or two of the officers should have immediately gone to him and and secured his hands of all the other officers were there to kind of keep an eye on him with their own own force options if he actually did anything Those might have those all might have been better things. I'm sorry. Go ahead. They all might be better things, but that's not the standard Well, well, I think, well, I think what testified the situation was under control at that point. And again, I think I need to emphasize he did put his service pistol away and took out his taser. So I'm not really sure that You know, I don't think a reasonable officer would believe him to be armed based on his attire, but I'm not so sure that officer white even believe that and he actually didn't say he believed he was armed. He said that he was he assessed that he was capable of possessing a firearm, which I think is belied by the the Russell versus Richardson Is there any dispute about the authenticity of the The audio file being in real time. No, Your Honor, we don't we don't dispute the authenticity of those of those recordings we what we do dispute, though, is whether Mr pros I did have a firearm on the roof, but I think for purposes of this case, it really doesn't frankly doesn't matter because by the well for two reasons. First of all, because of the radio call. So whether you're not he had one. One of the officers said he did. But more importantly than that, by the time he was at the window. It was clear to officer hazer. He was unarmed and it should have been clear to a reasonable officer in white shoes that he was unarmed. Can you clarify, because the audio recording things to be comprised of small segments, but it runs continuously. Is that all in real time. Is just that that tell us from beginning to end without a gap. That's the full recording from the initiation of the of the incident to to the MS. I'm not sure if it's a full recording of the whole incident. I, I, I seem to recall that it was only Sorry, I Can you say that again. There was interference. I seem to recall that the recording was only the call was only recorded when the offices actually use their radios, which would mean that we only have recording of when of when it was picking up sound. I don't know if it was. I don't, I don't believe it was it was during the whole. I mean, the whole incident was nine minutes long. We know that because the officers testified that they got there at 640 in the morning. They executed the warrant at 640 and we have this is in the record. We have the taser record or taser print out It was deployed at 649 so we know it's nine minutes. I don't think it's the whole time. I'm going back to an officer. He's or what, what can you point us to as clearly establishing for a reasonable officer that the use of stunning blows to the head in connection with an effort to pull someone back out of harm's way is unreasonable. If we think of that being a what's at issue here. Sure. And we don't have any case law suggesting that punching somebody much less punching someone while trying to pull them back in a window. I want to be clear factually analogous case law suggesting that that is illegal. I can, I can only imagine that this doesn't happen very often. The taser cases seem to be, you know, that's usually what officers seem to use when a person's at an elevated location. But I think it, I think it is disputed at the time that officer. He's or punched him, whether or not they were still holding on to Mr pros. Even the qualified immunity question you have to turn on. There's a factual determination that needs to be made as to at what point in the sequence. There were the blows to his head. Yes, absolutely. The court can't decide the qualified immunity issue because of those disputed facts. But I would add that I think it would be unreasonable, even if they were holding on to him, given that he was slippery, given that he was hanging out a window. I think under the circumstances, punching somebody only to then let go of them is just unreasonable. And I think that's clearly established by Tennessee versus Gardner and the taser cases. So, I understand your argument that is just obvious, but we've also been cautious and cautioned against taking too broad a view of a Gardner and just what's unreasonable. The other cases that you cited to us seem to be unpublished cases and cases from district courts. Where is the robust consensus of the type of authority we'd normally for clearly established in terms of precedential Court of Appeals decisions, if not Supreme Court decisions that would inform a reasonable officer that their actions were unconstitutional in this context. Sure. The Third Circuit in Fields versus City of Philadelphia said that district court decisions play a role in clearly established law. We just don't have Third Circuit or Supreme Court cases Directly saying that punching somebody that's hanging on a window violates clearly established law. But I would just argue that I don't think, and I'll point the court to the Seventh Circuit case in Phillips versus Community Insurance Corporation, where the court said, quote, every time the police employ a new weapon, officers do not get a free pass to move it along. Thank you very much, Mr. Harold, and thank you, Miss Ambrose. We've got the case under advisement.